58 CCPA

**Application of Ryohei ODA et al.**

**Patent Appeal No. 8466.**

United States Court of Customs and Patent Appeals.

July 1, 1971.

Arnold G. Gulko, Arlington, Va., attorney of record, for appellants.

S. Wm. Cochran, Washington, D. C., for Commissioner of Patents, R. E. Martin, Washington, D. C., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and RE, Judge, United States Customs Court, sitting by designation.

RICH, Judge.

This is a reissue case involving only questions of law as to compliance with 35 U.S.C. § 251. Patentability of the subject matter of the appealed claims, which are directed to chemical compounds, with respect to novelty, unobviousness, and utility, is not in issue. This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 1–3 of application serial No. 574,260, filed August 5, 1966, to reissue patent No. 3,244,730, granted April 5, 1966, on application filed July 17, 1963. We reverse.

### The Invention

The invention sufficiently appears from the appealed claims:

1. 5-nitro-3, 3-bis-(4-dimethylaminophenyl)-phthalide.

2. 5-acetylamino-3, 3-bis-(4-dimethylaminophenyl)-phthalide.

3. 5-benzoylamino-3, 3-bis-(4-dimethylaminophenyl)-phthalide.

The above phthalides are said to be useful as intermediates for conversion into basic dyes and also in pressure-sensitive copying papers of known construction because they are reactive with acidic clays to form a color.

The application for the original patent was prepared by translation into English from corresponding Japanese applications filed in May 1960 and July 1962, which are identified in the reissue oath. The oath points out that in the translation certain errors were made which are discussed in more detail later. The most important error was that "nitric acid" was mistranslated "nitrous acid." Of less importance, "ferrous oxide" in the U. S. application should have been "iron."

These errors were known to applicants' U. S. attorney before the patent issued. He thought he would be able to have them corrected, before the patent issued, by an amendment under Patent Office Rule 312, pertaining to amendments after allowance, which he filed February 2, 1966, but the examiners recommended against and refused entry. Four months after the issuance of the patent containing the translation errors, which were thought to affect its validity and therefore its adequacy to protect the compounds of the above claims by reason of an insufficient or inaccurate description of how to make them, under the first paragraph of 35 U.S.C. § 112, this application for reissue was filed.

### The Rejection

As background for understanding the rejection we set forth the text of 35 U.S.C. § 251, first paragraph, the rest of the section being irrelevant here (added emphasis ours):

§ 251. *Reissue of defective patents*

Whenever any patent is, through error without any deceptive intention, deemed wholly or partly *inoperative or invalid,* by reason of a *defective specification* or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent *for the invention disclosed in the original patent,* and in accordance with a new and *amended* application, for the unexpired part of the term of the original patent. *No new matter* shall be introduced into the application for reissue.

The posture of the case on appeal, so far as amendments to the specification are concerned, is that in three instances in the descriptive portion of the specification, including a specific example, the word "nitrous" is changed to "nitric" and in Example 2 the words "ferrous oxide" were first changed to "iron" and then to "reducing agent."[1] Additionally, three process claims (4–6) which contained references to "nitrous acid" have been cancelled or deleted from the patent.

The Examiner's Answer states:

Claims 1–3 stand rejected as being based on a specification containing new matter. 35 U.S.C. § 251; 35 U.S.C. § 112. The changes of "nitrous" to "nitric" and "ferrous oxide" to "iron" to "reducing agent" are deemed to be drawn to new matter. The specification is considered defective since without the introduction of new matter, the specification is drawn to inoperative embodiments. Applicants are not permitted to add new matter in order to disclose what they intended even though it can be shown that it was part of the original invention and had been inadvertently omitted from the original specification. The fact that the original specification is at variance with the Japanese

application * * * does not provide the proper basis for such a correction. Ex parte Bondiou et al., 132 USPQ 356 [Pat.Off.Bd.App.1961]. Since both nitrous acid and nitric acid are known to effect the nitration process, the error would not be considered obvious by one of ordinary skill in the art.

This rejection can also be construed as being based on a defective oath. The oath should state facts and not conclusions or opinions. Applicants' oath, e. g., at page 2, line 1, in referring to the errors in translation as "obvious", fails to comply with these requirements. M.P.E.P. 1401.08; Ex parte Pfaudler, 1883 CD 1, 23 O.G. 269; Ex parte Timkin, 1883 CD 58, 24 O.G. 1089.

In affirming, the board first pointed out that the appealed claims correspond "exactly to the identically numbered claims of appellants' original patent," thus making it clear that there will be no change whatever in the invention claimed by virtue of reissue, if permitted. The board pointed out that the whole controversy revolves around the section 251 provisions relating to "error without any deceptive intention" and "new matter." With an extensive effort to deflate all of appellants' arguments to the contrary, the board held that the change of "nitrous" to "nitric" would be "new matter."

The board next took up the question of "error" under section 251, a question the examiner had not raised at all. Indeed, the Examiner's Answer appears throughout to assume there was error and nothing was said about deceptive intention. The board, however, seemingly sua sponte, made a new approach to the question of whether there was "error without any deceptive intention" and reached the conclusion that "appellants' showing of 'error' under 35 U.S.C. § 251 must be held to be insufficient." This new holding seems to have been based

---

[1]. At another point appellants deleted by amendment the words "ferrous oxide and," after first changing "ferrous oxide" to "iron."

not on the *absence* of error but on appellants' attorney's handling of the prosecution—his "course of action"—in permitting the patent to issue, knowing of the errors in it, and in the time he took for various matters, such as discussing the errors with another attorney and getting information from Japan and from a local expert. Frankly, we do not follow the board's reasoning on this point.

Finally the board took up the other question of whether the changes involving the "ferrous oxide" amounted to insertion of "new matter." The board disagreed with the examiner in considerable part in finding that the simple deletion of the words was not in violation of section 251. It said:

> No new matter would be involved in the cancellation, and the term "reducing agents" is found in the original application. Moreover, the record does not reveal that the error in "ferrous oxide" was known as early as the error in "nitrous acid."

It nevertheless found "a new matter aspect" in the changes made because the deletion of "ferrous oxide" from Example 2 and its replacement by "reducing agent" would cause the example to be somewhat confusing. On this point, therefore, the "new matter" issue would seem to be converted into the question whether the creation of confusion or ambiguity by a change in a specification constitutes a violation of the prohibition against "new matter."

## OPINION

This court on previous occasions, particularly since the effective date of the 1952 Patent Act, has observed that the reissue statute is based on fundamental principles of equity and fairness and that, as a remedial provision, intended to bail applicants out of difficult situations into which they get "without any

deceptive intention," it should be liberally construed so as to carry out its purpose to the end that justice may be done to both patentees and the public. In re Willingham, 282 F.2d 353, 48 CCPA 727 (1960); In re Wesseler, 367 F.2d 838, 54 CCPA 735 (1966). Both of these cases were cited with approval, for the proposition we have stated, in Reeves Bros., Inc. v. U. S. Laminating Corp., 282 F.Supp. 118, 127 (E.D.N.Y.1968). At the same time we are realistic enough to appreciate that sharp applicants must be watched with a sharp eye. This is nothing new in the legal field.

The problem here is whether the changes appellants wish to make constitute "new matter" within the meaning of section 251.[2] "New Matter" is a technical legal term in patent law—a term of art. Its meaning has never been clearly defined for it cannot be. The term is on a par with such terms as infringement, obviousness, priority, abandonment, and the like which express ultimate legal conclusions and are in the nature of labels attached to results after they have been reached by processes of reasoning grounded on analyses of factual situations. In other words, the statute gives us no help in determining what is or is not "new matter." We have to decide on a case-by-case basis what changes are prohibited as "new matter" and what changes are not.

In a sense, anything inserted in a specification that was not there before is new to the specification but that does not necessarily mean it is prohibited as "new matter."

Robinson On Patents (1890), § 561, in discussing amendment of applications, says:

> No new matter can under any circumstances be introduced by amendment. New matter is that which is not found in the specification, drawings, or model, as first filed, *and*

---

2. The same term appears in 35 U.S.C. § 132 permitting applications for original patents to be amended. It provides that "No amendment shall introduce new matter into the disclosure of the invention." Presumably, and we believe desirably, the same term would and should have the same meaning in both contexts.

*which involves a departure from the original invention.* [Emphasis ours.]

In the chapter on reissues, Walker on Patents, first Deller's Edition (1937), § 311 New Matter, says: [3]

> The provision, first enacted in The Patent Act of 1870 * * * that "no new matter shall be introduced into the specification" is merely another way of saying that a reissued patent shall be for the same invention as the original. * * * That provision, therefore, neither enlarged nor restricted the reissuability of Letters Patent; and, accordingly, it is not new matter, within its meaning, to state a new use of the invention shown in the original * * * nor to explain, in a reissue, the operation of a device which in the original was only described * * * nor to vary the description of anything described in the original.

Of course, these generalities are not the whole story and leave many unanswered questions.

Rivise and Caesar, in Patentability and Validity (1936), in a discussion of former Patent Office Rule 70, which is now Rule 118, say, in § 248:

> This rule is known as "the rule against new matter" and is intended to prevent an applicant under the guise of an amendment from introducing into his application *a wholly different invention or changing the construction of a fully disclosed invention or presenting a different or preferred form of the invention.* The applicant must stand or fall on his original disclosure and all amendments must conform thereto. This rule appears very simple but patent tribunals have experienced considerable difficulty in interpreting and applying it in practice. [Emphasis ours.]

The authors then proceed to list 14 categories into which they have put the adjudicated cases, the first of which is

1. Amendments purporting to correct errors or supply omissions in features which are essential to the completeness of the disclosure.

This point they then discuss for four pages in § 249 from which we extract the following (all emphasis ours):

> Amendments purporting *to correct errors* or to supply omissions in features which are essential to the *operativeness* of the invention or the completeness of the disclosure *are permissible, if the errors are manifest* and were caused by a clerical mistake of the draftsman or unfamiliarity of the inventor with official forms *and the proposed corrections do not change the essence of the invention.* * * *
>
> * * * * * *
>
> If the changes necessary to make the disclosed device operative are *radical* in their nature and constitute a *departure from the invention originally disclosed,* they are not permissible.

A case discussed at great length in the above section is an interference decided by this court, Quigley v. Zimmerman, 73 F.2d 499, 22 CCPA 713 (1934), wherein, in the course of discussing a "new matter" problem, the court said (emphasis ours):

> That amendments may be made to patent applications for the purpose of *curing defects, obvious to one skilled in the art,* in the drawings or written descriptions of inventions, is so well settled that we deem it unnecessary to cite authorities in support thereof.

■ With this general background on the law, admittedly sketchy, we turn to the specific problems before us in this case. The first question is whether, under all the circumstances, the changing of "nitrous" to "nitric" involves "new matter."

Running through the foregoing discussion of the law is the clear and basic concept that *the invention* described in

---

3. Deller's Second Edition, § 304, is the same except for a reference to the 1952 Patent Act's prohibition of new matter in § 251.

the original patent must not be changed. We note, first of all, that that is not a problem in this case. The invention before us, as defined in the claims, consists of three specific chemical compounds. There is no change proposed in the claims or in the description of the claimed compounds in the specification. There is no deviation whatever with respect to the invention.

The change from nitrous to nitric acid occurs only in description of how to make the claimed compounds, which is not the invention since no process is now claimed. In the principal illustrative example (wherein two of the three occurrences of "nitrous" appear), Example 1, is the following key passage (emphasis added):

> A liquid mixture (5.5 ml.) of sulfuric acid (specific gravity 1.80) and *nitrous acid (specific gravity 1.45)* having a ratio of sulfuric acid to *nitrous* acid of 5:1 is gradually added to the solution of phthalide coumpound in sulfuric acid and the mixture so-produced is maintained at a temperature in the range of from 0–30° C. for one hour.

This is part of the description of a nitrating process which the record in this case shows to be a well-known reaction.

Appellants have produced affidavit evidence from an apparently well-qualified chemist, Dr. Zisman, for 10 years prior to making his 1966 affidavit Superintendent of the Chemistry Division of the U. S. Naval Research Laboratory, showing that the passage underlined above is obviously in error. Obviousness is predicated on the fact that nitrous acid cannot exist at a specific gravity of 1.45 because the solubility in water of nitrous oxide is so low that it is not feasible to provide nitrous [4] acid at specific gravities in excess of approximately 1.023, thus making the existence

of error apparent on the face of the patent.

Either the term "nitrous acid" is wrong or the specific gravity is wrong. The Patent Office contends that there is no way of telling which it is, but appellants submit several good reasons in support of their contention that one skilled in the art would know that it is the acid that is misnamed. We think appellants have the better of the argument. The Patent Office sets up the number of occurrences of "nitrous"— six, counting the three original process claims no longer in the case—as against the single occurrence of the numeral and says mistakes in numerals are very common. We do not find this numerical argument weighty. Once the translator decided, incorrectly, that what the Japanese application said was "nitrous" it was only reasonable that he should be consistent; we are considering a translation error, not a typographical error. Appellants make four points based on the Zisman affidavit as to why a skilled chemist would assume that nitric acid was meant: (1) A specific gravity of 1.45 is correct for concentrated nitric acid, the evidence being that it would represent 79.5% $HNO_3$; (2) nitric acid is the acid normally used in admixture with sulfuric acid for nitrating; (3) nitrous acid is known not to be desirable for the nitration of amine, and amines are here being nitrated; (4) even if nitrous acid were used it would be generated in situ because of its instability in aqueous solution, but that is not how the nitration process is described in the patent. In addition to and on the basis of these reasons, Dr. Zisman expressed his judgment as a chemist that it was clear to him that nitric acid was intended. There appears to be a fifth reason brought out in argument, namely, that specific gravity is an inappropriate way of identifying the concentration of ni-

---

4. As an illustration of how human it is to err, we take note of an error in this Zisman affidavit where he used the word "nitric" at this crucial point in the af-fidavit although the context makes it perfectly clear that he meant to say "nitrous." No one appears to contest that that was the intention.

trous acid in water because its maximum specific gravity of 1.023 is too close to that of water, which is 1.000. On all the evidence, we conclude that one skilled in the art would appreciate not only the existence of error in the specification but what the error is. As a corollary, it follows that when the nature of this error is known it is also known how to correct it. We therefore disagree with the board's first conclusion that the change of "nitrous" to "nitric" is "new matter."

We also think there is adequate evidence in the record to show that the error in saying "nitrous" instead of "nitric" was a translation error. The reissue oath, made by all four inventors, so states. A separate affidavit of Hiroshi Fujii, one of the inventors, familiar with the U. S. application and the corresponding Japanese application, states that in the Japanese application "the word 'nitric' [in Japanese, presumably] is used at each place" where the word "nitrous" appears in the U. S. application and that the error was due to faulty translation of the Japanese into English. Beside that, all of the circumstances of the case as shown by correspondence introduced with the affidavit of Arnold G. Gulko, the U. S. attorney, point to the existence of a translation error which was discovered by the inventors during the prosecution. The Patent Office complains that there is no certified copy of the Japanese application on file and no sworn translation. While no doubt the best evidence of translation error would be, in part, a copy of the Japanese application or patent, its absence is not fatal since we find the evidence of record sufficient. There is not the slightest evidence to cast doubt on appellants' assertions or any suggestion they are trying to change the nature of the invention patented.

■ The board's second point is that there has been no "error without any de-

ceptive intention." As stated above, this was not a ground of rejection put forward by the examiner. The Patent Office brief admits the board raised the question on its own. We have read the board's argument with care and still are not clear as to the basis on which it found no "error." Its finding seems to be based on a mixture of two things: the amount of *time* the attorney took to carry out various aspects of the prosecution after he became aware of the error and that he *knew* there was error in the patent when he allowed it to issue. What happened was that after becoming aware of the error an attempt was made to correct it by amendment filed February 2, 1966, under Rule 312 (Amendments after allowance). Entry of the amendment was refused on February 14 and the patent issued on April 5, 1966. Recourse was then had to this reissue application filed August 5, 1966.

What the 1952 statute says is that when the patent is deemed "inoperative or invalid"—i. e., it is ineffective to protect the invention adequately or it is a nullity—and it is so because of *error*, and the applicant for reissue is not guilty of "any deceptive intention," then the patent may be reissued, subject to the other provisions of the statute. We are unable to find in this provision anything pertaining to the timeliness of an applicant's actions [5] in the prosecution of the application for the original patent. Neither do we find any prohibition of reissue on the ground the applicant or his attorney knew of the error at the time the original patent issued. The board seems to have premised its ruling on this point primarily on Ex parte Ziherl, 116 USPQ 162 (Pat.Off.Bd.App. 1957). Although that case was decided after the 1952 Patent Act, the opinion makes it clear that the term "error" therein was equated with the term "inadvertence, accident or mistake" of the prior statute, R.S. 4916, former 35 U.S.

---

5. The only provision in § 251 relating to time is the last paragraph which provides that a reissue "enlarging the scope of the claims" must be applied for within two years from the patent grant.

C. § 64. In *Wesseler,* supra, we ruled that the 1952 reissue statute broadened the term "error" by not limiting it to 'error" that had arisen through "inadvertence, accident, or mistake." *Wesseler* was subsequent to *Ziherl.* Cases relying on the language of the former statute are no longer controlling. To "equate" the language of the present statute with that of the old statute, as was done in the *Ziherl* opinion, is to ignore the change that Congress made and to deny to applicants the benefit of the intentional broadening. Nothing the board has said persuades us that this is not a case of "error without any deceptive intention." In fact, the record as a whole presents a picture of prosecution conducted in complete good faith.[6]

■ The board's final point brings us back to an attempt to rectify another translation error and as in the other case we have the reissue oath and a second Fujii affidavit as evidence establishing the existence of error due to faulty translation. In two places the specification mentions "ferrous oxide," which served in the process of making the claimed compounds as a reducing agent. The specification says it is a reducing agent and names others. The oath and affidavit say the correct translation should have been "iron" rather than "ferrous oxide." The reissue sought to make this change, but after filing, by amendment, appellants deleted both references to "iron" and in Example 2 inserted in its place "reducing agent." The board partially reversed the examiner in saying that the *deletions* did not result in "new matter." However, the board found that, with the change, Example 2 "would be confusing" for lack of an antecedent for the expression "essentially free of ferric hydroxide contamination." It deemed this "a new matter aspect" and said:

To the limited extent indicated by the foregoing discussion, the holding of new matter in Example 2 will be sustained.

We do not agree with the "new matter" rejection under these circumstances. The mere fact that a change deprives a phrase of a needed antecedent so that a reader might be somewhat perplexed or confused does not result in the injection into a specification of prohibited "new matter" within the meaning of § 251. It may give rise to a need for rewriting or clarification and be ground for a rejection under § 112, first paragraph, but a "new matter" rejection because of that defect is unwarranted.

Since we disagree with the board on each of the three grounds on which it sustained the rejection, its decision is reversed.

Reversed.

---

6. The Patent Office appears to admit that it was. A footnote to the Solicitor's brief says:

The record shows that appellants are not charged with "any deceptive intention", as that expression is used in Section 251.